PER CURIAM.
In an action for services and goods sold and delivered appellant, co-defendant below, seeks review of an adverse final judgment in the amount of $39,650.
The record on appeal reflects that Canaveral International Corporation is a publicly owned holding corporation which conducts various businesses through wholly owned subsidiaries. One such wholly owned corporation is Freeport Ridge Estates, Ltd., an organization which owned, developed and subdivided a large tract of land on Grand Bahama Island for the purpose of selling lots to members of the public at a profit. Heritage Land Sales, Inc. is a corporation founded in 1964 for the express purpose of acting as a sales broker, promoter and agent for the sale of real estate in the Bahamas. Most of the stock in Heritage was owned by Bert Dubbin, the son of Canaveral’s board chairman, Henry Dubbin, and nephew of Canaveral and Freeport’s president, Daniel Dubbin. The familial relationships that existed between the Dubbins was the only link Heritage had with Canaveral and Freeport. Canaveral and Freeport did not own any of Heritage’s stock nor did they place any person upon Heritage’s board of directors.
In 1965 Heritage entered into an agreement with Freeport to act as Freeport’s broker or agent for the sale of Bahamian lots. Heritage was to get a commission on each lot sold and on two subsequent occasions the commission Heritage was to receive increased. This increase was due in part to Heritage’s mounting financial problems and as these problems increased, the operational relationship between these two corporations became closer. Heritage moved from its main offices into the Canaveral Building and over a two and one-half year period Freeport advanced to Heritage between $600,000 and $700,000. These advances allowed Heritage to operate and provide working capital that was used for, among other things, payrolls and advertising. In the beginning of 1967, Daniel Dubbin, president of Freeport, had his secretary become a signatory on all checks written by Heritage to make certain that the funds were being properly disbursed. Eventually the relationship of Heritage with Canaveral and Freeport was terminated and the uncollected sums owed by Heritage were written off as bad debts.
Richard G. Reckner, appellee, was retained to fly prospective buyers from the United States to Grand Bahama Island to view lots that were for sale. When Reck-ner was first hired he met with Bert Dubbin and Daniel Dubbin to discuss the proposed operation and an oral contract was entered. Reckner was to be in charge of the flights, hire the pilots and maintain the airplanes used for the flights. The plane service commenced in September, 1966 and for his services Reckner was to *131 bill Heritage although he did not know the exact relationship between Freeport and Heritage. Evidence of Freeport’s subsequent control over Reckner include: Reck-ner’s 'schedules were set by Freeport executives, any problems he had were to be taken to a Freeport vice president, he acted as a private pilot for Daniel Dubbin in an aircraft owned by one of Canaveral’s subsidiaries, and the bills submitted to Heritage were subject to approval by Free-port.
During the deterioration of Heritage’s financial position, Reckner had difficulty receiving payment for bills submitted to Heritage and as the amount increased, Reckner sought payment from Freeport but was told he could only collect from Heritage. The flights were discontinued after June, 1967, after which date all payments to Reckner ceased with an outstanding bill of $39,650 and a plan was arranged to help satisfy the debt owed to Reckner. Reckner agreed to purchase certain lots for which Heritage would earn its standard commission from Freeport. When the commission was received by Heritage it would be paid to Reckner, then he would endorse the check over to Freeport as the down payment for the lots. The balance of the sale price for the lots was reflected by a purchase money mortgage. Reckner planned to sell the lots at a profit.
On June 30, 1967 the plan was put into effect and Reckner received a check from Heritage for $25,600 which he then endorsed over to Freeport. Reckner, however, was unable to sell any of the lots and defaulted on his mortgage payments to Freeport. This lawsuit was brought against Freeport and Canaveral to recover the total amount owed to Reckner, $39,-650. At trial the jury returned a verdict in favor of Reckner for $39,650 and this appeal was taken by Freeport and Canaveral.
Relying upon the record on appeal, the relationship between Freeport and Reckner was one of principal and sub-agent. An overview of the facts clearly establishes that Heritage, by reason of Freeport’s complete control of financial affairs and policy decisions, was the agent of Freeport and that Reckner was to function as a sub-agent. In his capacity as a sub-agent appointed pursuant to the implied authority of the principal, Reckner in the absence of an express agreement to the contrary which does not exist in the instant case, can look directly to the principal for his compensation. Peace River Phosphate Mining Co. v. Thomas A. Green, Inc., 102 Fla. 370, 135 So. 828 (1931); Whidden v. Morse, Fla.App.1968, 213 So.2d 625.
The power of an agent to delegate authority to a sub-agent is proper if the delegation merely involves a ministerial act such as the showing of land. Peace River Phosphate Mining Co. v. Thomas A. Green, Inc., supra. Reckner’s duty to fly prospective purchasers to Grand Bahama Island will qualify as the requisite ministerial act.
The $25,600 received by Reckner from Heritage used in part payment of his purchase of the Bahamian lots should reduce the jury’s verdict of $39,650 to $14,-050. The plan initiated by the parties and this sum of money was voluntarily accepted by Reckner and he cannot now be heard to the contrary.
For the reasons stated, the judgment is affirmed in part and modified in part as set out herein, and the cause is remanded to the Circuit Court for further proceedings not inconsistent herewith.